IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 2, 2016

**IN RE  DERRICK J., ET AL.**

**Appeal from the Juvenile Court for Washington County**
**No. 44599, 44600, 44601   Sharon M. Green, Judge**

———————————————————

**No. E2015-01507-COA-R3-PT-FILED-JULY 8, 2016**

———————————————————

This is a termination of parental rights case.  Appellants appeal the trial court's termination of their parental rights to three minor children on the grounds of: (1) abandonment by failure to provide suitable housing; (2) persistence of the conditions that led to the removal of the children from Appellants' home; and (3) severe child abuse.  As to Appellant/Mother, the trial court also found that Appellee, the Department of Children's Services, had proven, by clear and convincing evidence, that mother failed to substantially comply with the requirements set out in the permanency plan; mother appeals the termination of her parental rights on this additional ground.  Appellants also appeal the trial court's determination that termination of their parental rights is in the best interests of the children.  Discerning no error, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT, and THOMAS R. FRIERSON, II, JJ., joined.

William Freemon, Johnson City, Tennessee, for the appellant, Elizabeth J., and Carl Roberts, Jr., Elizabethton, TN, for the appellant, Jeremiah J.

Herbert H. Slatery, III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. Background**

This case involves three minor children, Derrick J. (born October 2006),[1] Destiny J. (born February 2009), and Dustin J. (born October 2011) (collectively, the "Children"). The Children's mother is Elizabeth J. ("Mother"), and their Father is Jeremiah J. ("Father," and together with Mother, "Parents," or "Appellants").[2]   The Tennessee Department of Children's Services ("DCS," or "Appellee") first became involved with this family on November 4, 2012, when it received a referral for drug exposed child.  In November of 2012, Families Free, a faith-oriented, community-based organization that offers assistance to families with children at risk of going into the foster care system, visited the Appellants' home at DCS's request.  According to the testimony, the Families Free employee found Appellants' home to be cluttered and dirty; it was also reported that Elizabeth J. was drunk and giving her four-year-old alcohol.

On December 13, 2012, DCS received a second referral for environmental neglect. Upon investigation, DCS discovered that Destiny had lice and had been sent home from school eleven times since October of 2012.  Although the school provided lice shampoo to Mother, the child continued to come to school with lice. DCS also conducted a home visit in December of 2012 and found that the home was in a deplorable condition and that no improvements had been made since Families Free had visited earlier that month.  DCS met with the parents on December 18, 2012 to develop a non-custodial permanency plan to ensure the safety and well-being of the Children.  DCS proposed that the family continue to work with in-home services, and Mother was charged with contacting a doctor to get prescription treatment for Destiny's lice.  In addition, the parents were to maintain a clean home free of all safety hazards, and Mother was to submit to drug and alcohol assessment and follow all recommendations.  The parents agreed to the plan.

On December 20, 2012, DCS filed a "Petition for Order Controlling Conduct and for Protective Supervision" in the Juvenile Court for Johnson City, Tennessee (the "trial court"). By order of February 12, 2013, the trial court continued the hearing on DCS's petition pending appointment of counsel for the Parents.  The trial court ordered that the Children would remain in Appellants' custody pending an adjudicatory hearing.  On March 26, 2013, the trial court held an adjudicatory hearing on DCS's petition.  At the hearing, both parents

---

[1] There is dispute in the record as to the proper spelling of Derrick's name.  The child's birth certificate lists the child's name as "Derek;" for purposes of the appeal, we will use the spelling set out on the petition to terminate parental rights, i.e., Derrick.  We also noted that there is discrepancy in the record as to the spelling of Father's name.  It is spelled both "Jerimiah" and "Jeremiah."  For purposes of the appeal, we will use the spelling indicated on the petition to terminate parental rights, i.e., Jeremiah.

[2] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

stipulated to a finding of dependency and neglect, by clear and convincing evidence, for the reasons set out in the petition, specifically:

> Upon investigation DCS discovered the home was in deplorable condition. There was dried food on the floor and the counters in the kitchen and dirty dishes in the sink. There were mattresses on the floor without sheets or linens which were very filthy. The children were improperly clothed for the weather and were not clean. There was [sic] liquor bottles found throughout the home all of which were empty. DCS determined the mother's sister . . . her boyfriend . . . and their two children were also residing in the home.
> DCS drug screened the mother who tested positive for benzodiazepines without a valid prescription and no explanation. The father was unable to produce a sample for testing at the time of the home visit.

On April 3, 2013, Family Support Services were placed in the home to address the issues that led to DCS's involvement. DCS conducted home visits on April 12, 2013, April 18, 2013, April 24, 2013, May 13, 2013, and June 14, 2013. DCS's reports indicate that, during those visits, DCS employees observed numerous safety and environmental concerns in the Appellants' home. The trial court held a hearing on June 18, 2013, at which time the court informed Appellants that, if their living situation did not improve, the court would remove the Children from the home. The court also ordered the Appellants to attend parenting classes and ordered Father to complete a drug and alcohol treatment program. On June 20, 2013, DCS conducted a home visit and found that the home was still in deplorable condition. At that time, DCS did a walkthrough of each room. DCS noted a cockroach infestation and observed roach feces and molded food in the kitchen cabinets. DCS also noted that alcohol was present in the home. DCS again advised Appellants that they needed to clean and maintain the home; to this end, DCS provided resources to assist the parents. DCS also noted that Derrick had a cough that needed to be addressed and instructed Mother to take the child to the doctor.

On June 27, 2013, DCS conducted a follow-up visit. By this time, Rachel Ratliff had been appointed guardian ad litem, and Ms. Ratliff was present at this home visit. At that time, the following concerns were noted:

1. The minor child, Dustin, had a diaper that was oversaturated in both urine and feces;
2. Garbage and spoiled food were all about the house;
3. The children were dirty, to such an extent that they appeared to not have been bathed in days;
4. Dustin and Destiny had a foul odor of uncleanliness about their persons;
5. Roaches and bugs were observed throughout the home;
6. Dirty and unwashed dishes were left in the sink
7. New bottles of alcohol were observed in the freezer

8. Father had not yet scheduled his drug and alcohol assessment
9. Derrick had not been seen by a doctor for his cough
10. Appellants had not scheduled parenting classes.

After assessing the home environment, the DCS employee and the guardian ad litem agreed that the house was not safe for the Children and that the Children's basic needs were not being met. Accordingly, DCS removed the Children from the home. Upon arrival at DCS, all three Children had to be bathed. During the bath, DCS employees observed a bruise on Destiny's shoulder blade. When the child was asked how she suffered the injury, she informed DCS that Father had caused the injury by "poking" her. DCS also observed red marks that appeared to be insect bites on all of the Children's bodies. On July 1, 2013, DCS filed a petition to adjudicate dependency and neglect and for temporary custody of the minor Children. On the same day, the trial court entered a protective custody order, placing temporary custody of the Children with DCS.

On July 2, 2013, the trial court held a preliminary hearing on the petition for dependency and neglect. Appellants were present at the hearing and waived the probable cause hearing. The trial court entered subsequent orders that the Children would remain in DCS custody pending an adjudicatory hearing. DCS and the Parents entered into permanency plans for the Children, discussed *infra*. The last of these plans was affirmed and ratified by the trial court on December 6, 2013.

On October 15, 2013, the trial court held an adjudicatory hearing on DCS's July 1, 2013 dependency and neglect petition. The trial court entered an order on November 11, 2013. In relevant part, the order provides that "[t]he Parents, through counsel, stipulated to dependency and neglect by clear and convincing evidence based only on environmental neglect." Based on the Parents' stipulation, the trial court found that the children were dependent and neglected. The dispositional phase of the hearing was continued to December 6, 2013.

On December 6, 2013, the trial court approved a ninety-day trial home placement, which was to begin on December 20, 2013. The trial home placement was subject to certain conditions, namely: (1) the parents would keep the home as clean as it appeared in photographs presented to the court at the adjudicatory hearing; (2) the parents would clean the kitchen and bathroom daily; (3) the parents would not leave any food out in an unsanitary manner; (4) the parents would find another home for their dog and cat due to animal feces and urine inside the home; (5) parents would spray the perimeter of the home with bug spray; and (6) parents would ensure that there was no alcohol in the home. On December 17, 2013, the guardian ad litem filed a motion to revoke the trial home placement, which had not yet begun, due to the deteriorated conditions in Appellants' home. The trial court granted the guardian ad litem's motion and suspended the December 2013 trial home placement. The Children remained in DCS's custody.

Despite the previous suspension of the trial home placement, on April 15, 2014, the court allowed a trial home placement to proceed; however, the Children remained in the legal custody of DCS during the trial home placement. On June 10, 2014, the trial court held a status hearing. Although, at that time, DCS did not request suspension of the home placement, both DCS and the guardian ad litem noted that the conditions in the home had once again deteriorated. Based on the testimony, the trial court found that: (1) the Children had expressed that they were hungry while living in Appellants' home; (2) there were no sheets on the Children's beds when DCS went to the home; (3) food was scattered throughout the home; (4) bugs were observed in the home; (5) food was left in the oven; (6) the Parents had either missed or failed to schedule follow-up appointments with the Children's doctors; and (7) the Children were dirty.

Six days later, on June 16, 2014, DCS went to the Appellants' home at approximately 8:00 p.m. DCS observed a mattress in the middle of the floor, and noted that it was difficult to walk around the mattress because of trash and clutter. According to Child Protective Services ("CPS") investigators, Karen Thompson and Emily Hodge, all of the Children were dirty. Dustin was observed to have on nothing but a diaper, a pair of socks, and a t-shirt. He was in need of a diaper change and had dried feces on his buttocks. Ms. Thompson and Ms. Hodge also observed that Dustin had a burn on his arm. The Parents had created a makeshift bandage out of toilet paper and scotch tape; however, part of the burn could be seen beneath the bandage. The toilet paper bandage was dirty, and pieces of the child's skin were falling off at the burn site. The Parents presented a tube of Neosporin and indicated that they had been applying the salve to the burn; however, DCS observed that the Neosporin had expired in 2009. When asked, Mother told Ms. Hodge that the child had been burned by a bowl of Ramen noodles. Specifically, Mother told Ms. Hodge that she had turned around to help Destiny, and, while her back was turned, Dustin (while standing on a stool) had pulled the bowl of soup out of the microwave onto himself. Mother was unable to produce the stool when asked to do so. At that time, Dustin was too young to tell what had happened to cause the burn; however, it is undisputed that Mother was the sole caregiver at the time of the injury. Mother was the only adult present when Dustin was burned; when Father returned home and observed the injury, however, he did not seek medical treatment. The burn was ultimately diagnosed as a second-degree burn. Based on the foregoing testimony, on June 16, 2014, the trial court revoked the trial home placement by ex parte order. The Children were then returned to the physical custody of DCS.

By August 25, 2014, DCS had assigned the case to Family Service Worker, Amy Serota-Cook. Ms. Serota-Cook testified that she went to the home on August 25, 2014 and found that no one was home. When Ms. Serota-Cook made contact with Appellants, they informed her that Mother had left the home because the Appellants were fighting, but Mother had subsequently returned to the home. There is no evidence that Appellants informed DCS that their living situation had changed.

On September 9, 2014, DCS filed a petition to terminate Appellants' parental rights. As grounds for termination of parental rights, DCS averred: (1) abandonment by failure to provide a suitable home, Tennessee Code Annotated Sections 36-1-113(g)(1) and 36-1-102(1)(A)(ii); (2) substantial noncompliance with the Tennessee Code Annotated Section37-2-403 permanency plan, Tennessee Code Annotated Sections 36-1-113(g)(2); (3) persistence of conditions, Tennessee Code Annotated Section 36-1-113(g)(3); and (4) severe child abuse, Tennessee Code Annotated Sections 36-1-113(g)(4) and 37-1-102(b)(21). DCS also averred that termination of Appellants' parental rights was in the Children's best interests. On November 24, 2014, Elizabeth J. filed an answer in opposition to the petition to terminate her parental rights. Likewise, on December 2, 2014, Jeremiah J. filed an answer in opposition to the petition to terminate his parental rights.

On November 3, 2014, DCS held a child and family team meeting to discuss the fact that the Appellants were on the verge of being evicted. The Parents were, in fact, evicted in December of 2014; however, there is no evidence that they advised DCS of this fact. When DCS attempted to conduct a home visit on January 7, 2015, the Parents were not at home, and the house appeared to be vacant. On January 14, 2015, Ms. Serota-Cook spoke with Mother, who stated that she and Father were staying with Mother's sister in public housing. The record indicates that, by March 4, 2015, the Appellants were living in a motel. Although the hearing on the petition to terminate their parental rights had commenced on January 26, 2015, on April 1, 2015, DCS discovered that the Parents had signed a lease for a new residence. A copy of the lease was admitted into evidence at the hearing on the petition to terminate parental rights. In relevant part, the lease agreement provides that the apartment had only two bedrooms, and the agreement states that adults and no children will be living there. On April 20, 2015, DCS attempted to conduct a home visit at the Parents' new residence. Ms. Serota-Cook noted a foul odor around the new home, although she could not testify as to the cause of the odor. During the hearing on the petition to terminate parental rights, Appellants presented photographs of the new home that were allegedly taken within three weeks of the time Appellants had moved into the apartment. As noted in the trial court's order terminating parental rights, the photographs "depict a home that is basically empty of children's beds." The photographs "show an air mattress on the floor in close proximity to a wall heater with bedding stacked on it." "The photographs also show a large flat screen entertainment center with wiring for multiple attachments, an extensive DVD collection;" however, the only furnishing in the room is a chair with no legs.

On June 10, 2015, DCS conducted another home visit at the Appellants' apartment. DCS discovered that the Parents had permitted another family of five to move into the apartment with them. The family of five had moved their belongings into one of the two bedrooms. Father testified that this family was "staying" in the apartment. Ms. Serota-Cook testified that Father told her the other family was "living" in the apartment. Regardless, while at the residence, DCS observed live maggots on the kitchen floor and a broken toddler bed with a sharp, rusted brace hanging from it.

The trial court heard the petition to terminate Appellants' parental rights on January 26, 2015, April 21, 2015, April 22, 2015, June 10, 2015, and June 24, 2015. By order of July 27, 2015, the trial court terminated Appellants' parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) persistence of conditions; and (3) severe child abuse. Although DCS also asserted the ground of substantial noncompliance with the requirements of the permanency plan against both Parents, the trial court specifically found that DCS had not met its burden of proof as to this ground *vis-à-vis* Father. However, the trial court found that DCS had proven the substantial noncompliance ground as to Mother. The trial court specifically held that DCS had made reasonable efforts to assist Appellants. Appellants appeal.

## II. Issues

We note that Mother and Father are represented by different lawyers in this appeal, and both have filed separate appellate briefs. However, the issues raised in their respective briefs are essentially the same. We restate the dispositive issues as follows:

1. Whether there is clear and convincing evidence to support at least one of the grounds for termination of Appellants' respective parental rights.

2. Whether there is clear and convincing evidence to support the trial court's finding that termination of the Appellants' respective parental rights is in the children's best interests.

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash–Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the children's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination

and that termination of parental rights is in the children's best interests must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

### IV. Grounds for Termination of Parental Rights

As noted earlier, the trial court relied on the following statutory grounds in terminating Appellants' parental rights: (1) abandonment by failure to provide a suitable home, Tennessee Code Annotated Sections 36-1-113(g)(1) and 36-1-102(1)(A)(ii); (2) substantial noncompliance with the Tennessee Code Annotated Section 37-2-403 permanency plan, Tennessee Code Annotated Sections 36-1-113(g)(2); (3) persistence of conditions, Tennessee Code Annotated Section 36-1-113(g)(3); and (4) severe child abuse, Tennessee Code Annotated Sections 36-1-113(g)(4) and 37-1-102(b)(21). Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we will review all of the foregoing grounds.

### A. Reasonable Efforts

Before addressing the specific grounds for termination of Appellants' parental rights, we note that, historically, the decision to pursue a termination of parental rights on the grounds of abandonment and/or substantial noncompliance with a permanency plan has invoked DCS's statutory duty to make reasonable efforts to facilitate the safe return of children to the parent's home. *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008) (citing Tenn. Code Ann. §§ 37-1-166(b), –166(a)(2), –166(g)(2)); *see also In re Tiffany B.*, 228 S.W.3d 148, 151, 160 (Tenn. Ct. App. 2007) (vacating a finding of abandonment, substantial noncompliance, and persistence of conditions for failure to make reasonable efforts). However, in *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015), the Tennessee

Supreme Court specifically overruled "the holding of ***In re Tiffany B***. and other cases following the holding in ***In re C.M.M.*** to the extent that the court required DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights (citations omitted)." ***Id.*** at 555 n.34. Proof of reasonable efforts is specifically required by statute to prove the ground of abandonment by failure to provide a suitable home. However, even under that ground for termination, DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal." ***Id.*** (citing Tenn. Code. Ann. § 36-1-102(1)(A)(ii)). In ***Kaliyah***, the Court specifically stated that

> proof of reasonable efforts is not a precondition to termination of parental rights of a respondent parent. As with other factual findings made in connection with the best interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. ***In re Audrey S.***, 182 S.W.3d at 861. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that the termination is in the child's best interest (citations omitted).

***Id***. at 555.

In the instant case, the trial court found that DCS made reasonable efforts to assist the Parents in satisfying the requirements contained in the permanency plans, *see* discussion *infra*. Specifically, the trial court found that,

> [t]hroughout the entirety of these proceedings, DCS has provided extensive services to assist the parents. DCS has made tremendous efforts to help them. Further, DCS has continually made many, many referrals and many, many efforts to assist the family throughout the underlying dependency and neglect proceedings that gave rise to this cause.

As set out in full context below, Tennessee Code Annotated Section 36-1-102(1)(A)(ii)'s definition of abandonment requires DCS to make reasonable efforts to assist the parents to establish a suitable home. The statute focuses on the four month period following removal of the children from the parents' custody. Here, the four-month period is June 27, 2013 through October 27, 2013. In its order terminating Appellants' parental rights, the trial court found that "[d]uring that four (4) month time, DCS made many reasonable efforts to assist the parents in providing a suitable home for the children. . . ." Although Appellants do not raise an issue concerning the trial court's findings on DCS's reasonable efforts, because DCS's obligation to provide reasonable efforts is triggered by the trial court's reliance on the grounds of abandonment by failure to provide suitable housing and substantial noncompliance with the requirements of the permanency plan, we have reviewed the record

to determine whether the evidence preponderates in favor of the trial court's findings concerning DCS's reasonable efforts. The record indicates that, during the relevant four-month period, DCS provided the following services:

a. DCS funded an in-home service provider, Families Free, to assist the family. Families Free provided Appellants' assistance with homemaking skills, parenting skills, and budgeting.
b. DCS made a referral for a clinical parenting assessment to be completed by in-home service provider, Foundations for Life Principles.
c. DCS conducted numerous home visits, *see supra*. During these visits DCS made suggestions on how the Appellants' could institute sanitary conditions in the home.
d. DCS kept the Appellants apprised of the Children's medical appointments.
e. DCS worked as liaison between AGAPE and Appellants to assist Appellants in procuring the required parenting classes.
f. DCS assisted father in completing a drug and alcohol assessment.
g. DCS provided therapeutic visitation services through Families Free.
h. DCS conducted a child and family team meeting on July 17, 2013 to develop a permanency plan to address the reasons for the Children's removal from the Appellants' home.
i. DCS maintained contact with the service providers to monitor Appellants' compliance.
j. DCS attended foster care review board meetings for the Children.
k. DCS kept the Parents apprised of court hearings and meetings regarding the Children.
l. After the Children were removed from Appellants' custody, DCS made numerous foster home visits to ensure that the Children's needs were being met. Specifically, DCS conducted six foster home visits during the first six weeks that the Children were in DCS custody.

Based on the foregoing services and the totality of the circumstances, we conclude that the record preponderates in favor of the trial court's finding that DCS satisfied its requirement to make reasonable efforts to assist the Appellants. Having determined that the reasonable efforts criterion is met for both the ground of abandonment by failure to provide suitable housing and the ground of substantial noncompliance with the requirements of the permanency plans, we now turn to address the specific grounds for termination of Appellants' parental rights.

### B. Abandonment by Failure to Provide Suitable Housing

Tennessee Code Annotated Section 36-1-113(g)(1) provides that termination of parental rights may be based on the ground of "[a]bandonment by the parent or guardian, as defined in § 36-1-102. . . ." Tennessee Code Annotated Section 36-1-102(1)(A)(ii) defines "abandonment" for purposes of termination of parental rights, in relevant part, as follows:

(ii) The child has been removed from the home of the parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

*Id.*

This Court has previously held that "in determining whether grounds for termination of the parental rights of a biological parent are established, both the trial court and this Court must look to the evidence of the parent's past actions, rather than the parent's future aspirations." ***In re Adoption of Logan A.S.***, No. W2009-02661-COA-R3-PT, 2010 WL 3984712, at *8 (Tenn. Ct. App. Oct. 12, 2010). As discussed above, the Children were taken from Appellants' custody and were adjudicated dependent and neglected, in part, because of Appellants' failure to provide a clean and stable home. The trial court's November 11, 2013 order on DCS's petition for dependency and neglect indicates that the Parents stipulated to dependency and neglect based on environmental neglect, and the court so found. The adjudication of dependency and neglect is not contested on appeal. The record indicates that DCS's petition was precipitated by a home visit on June 27, 2013, at which time DCS observed the following environmental problems in the home: (1) the minor child, Dustin, had a diaper that was oversaturated in both urine and feces; (2) garbage and spoiled food were all about the house; (3) the Children were dirty, to such an extent that they appeared to not have been bathed in days; (4) Dustin and Destiny had a foul odor of uncleanliness about their persons; (5) roaches and bugs were observed throughout the home; (6) dirty and unwashed dishes were left in the sink.

Almost immediately after DCS became involved with this family in 2012, Family Support Services were employed to assist the Appellants. At the hearing on the petition to terminate parental rights, Julie Lowry, the DCS Family Support Services case manager assigned to work with the family, testified. Ms. Lowry was assigned to the case in April 2013. In its order terminating Appellants' parental rights, the trial court made a specific finding that Ms. Lowry was a credible witness. Where the trial court's factual findings are based on its

- 11 -

determinations of the credibility of the witnesses, then this Court will afford great weight to those credibility determinations and will not reverse such determinations absent clear evidence to the contrary. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995).

Ms. Lowry testified concerning the conditions she observed in the Appellants' home during her tenure on the case. At her initial visit to the home, Ms. Lowry observed large, black, garbage bags in the living room, dirty dishes in the sink, old food on the stove, alcohol in the freezer, and "extensive clutter" throughout the home. Ms. Lowry noted that Father smelled of alcohol; when she asked him whether he was drinking, he told her the odor was "from the night before." At this time, Ms. Lowry indicated that, on a scale of one to ten, with one being the lowest, the condition of the home was a three.

Within a few days of her initial visit, Ms. Lowry returned to the home on April 16, 2013. In her opinion, the condition of the home had deteriorated since her first visit earlier that month. Ms. Lowry now indicated that the condition, on a scale of one to ten, had fallen to a two. Specifically, she observed the youngest child, Dustin, to be very dirty. He was wearing only a dirty sock. She noted that there was a dirty mattress on the floor of the living room. She found a child's crib that was cluttered with items, including pennies. The blankets were dirty, and, in fact, the child, Destiny, had been diagnosed with scabies.

Ms. Lowry came back to the home on April 18, 2013, and the condition had not improved. Although Ms. Lowry testified that she tried to encourage the Parents to take steps to clean up the house and, in fact, demonstrated how to clean the areas of concern, she again observed that the Children were dirty. There were piles of dirty clothes in the home. Dustin had mucus crusted on his nose. Ms. Lowry also observed dirty dishes, including the Children's sippy cups.

On June 20, 2013, Ms. Lowry visited the home and observed live cockroaches in the house. Ms. Lowry demonstrated to the Parents how to scrub the floors, wash the walls, and clean the bathroom. However, in a follow-up visit on June 27, 2013 (i.e., the visit that led to the removal of the Children from the Parents' home), Ms. Lowry observed that Dustin was wearing only a soiled diaper, and he had dried food on his face. Dustin's hair was "very, very matted and greasy." Destiny's hair was also matted. Mother told Ms. Lowry that the Children had been bathed "a couple of days ago." However, the Children had a foul odor about them. Ms. Lowry also observed bugs on the floor and window sills, a moldy pot of beans on the stove, and a bag of bread on the floor.

Ms. Lowry testified that she visited Appellants' home approximately nine times during the time she was assigned to the case. She testified that, at least 95% of the time, she observed food on the floor. Ms. Lowry further testified that she observed the Children eating food off the floor, or eating food that had been lying out for some time.

After the Children were taken into DCS custody, in July of 2013, the case was assigned to DCS employee, Brant Lee Orren. Like Ms. Lowry, Mr. Orren conducted several home visits. His first visit was on or about September 12, 2013. He testified that, when he arrived for the visit, Father was at home alone. Mr. Orren observed Father "playing Nintendo and drinking beer." Mr. Orren testified that the house was cluttered and dirty, with dirty dishes in the sink and on the stove. In Destiny's bedroom, Mr. Orren observed a hole in the ceiling and bugs in the window sill. When Mr. Orren confronted Father about the bugs, Father stated that "it would only take five minutes for him to clean them out . . . ." Following this visit, DCS noted some small improvement in the condition of the home, and, as noted above, the trial court approve a trial home placement on April 15, 2014. However, at a hearing on December 10, 2014, DCS and the guardian ad litem informed the trial court that the conditions in the home had again deteriorated. DCS informed the trial court that the case worker had observed bugs in the home, old food in the oven, food scattered throughout the house, no sheets on the Children's bed, and that the Children were dirty.

Despite reasonable efforts on the part of DCS, *see supra*, the record indicates that, following removal of the Children from Appellants' home, conditions did not improve. All evidence indicates that the Parents have failed to make necessary changes to ensure that their home is sanitary. Photographs that were admitted into evidence show that, throughout these proceedings, the conditions in the home remained relatively unchanged. There are pictures of what appears to be animal feces and urine on the floors and on the beds. One photograph shows animal feces lying on a child's toy; another shows feces on a bed next to a child's sippy cup. There are pictures of food left sitting on the stove and dirty dishes strewn throughout the house. There are also numerous pictures of bugs, both dead and alive, throughout the house. Bug excrement appears in several photographs. In addition, there are photos of alcohol in the home; beer cans are in the refrigerator and scattered around the house. One photograph depicts a floor HVAC vent. The vent is rusting and dirty, and there appear to be cigarette butts filling the vent itself as if the vent has been used as an ashtray. The photographs of the bathroom show a very dirty tub, with caulk hanging in strips where it has come out of the joint. There is also photographic evidence of the continuing clutter in the home. Clothes are piled around the house, and food is scattered on the floor. Mr. Orren testified that, from June 27, 2013 through October 27, 2013, he could not recommend that the Children be returned to the Appellants' home. We agree. After reviewing the entire record, we conclude that the evidence preponderates in favor of the trial court's factual findings, and that those findings establish by clear and convincing evidence that Appellants' parental rights may be terminated on the ground of abandonment by failure to provide a suitable home.

## C. Persistence of the Conditions that Led to the Children's Removal

Tennessee Code Annotated Section 36-1-113(g)(3) provides that termination of parental rights may be based upon persistence of conditions. Persistence of conditions is defined as:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months:

(A)  The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn.Ct.App.2010), overruled on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn.2015).

In *In re Audrey S.*, 182 S.W.3d 838, 872 (Tenn.Ct.App.2005), this Court held that, based on the statutory text and its historical development, the ground of persistence of conditions found in Tennessee Code Annotated Section 36-1-113(g)(3) provides a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse. In the instant case, and as discussed above, the Parents stipulated to a finding, by clear and convincing evidence, of dependency and neglect based on environmental neglect. As discussed in great detail above, the conditions that led to the Children's removal from Appellants' home, i.e., unsanitary conditions, bugs, and filth, have not been remedied. It appears that despite DCS's best efforts, the Parents have made no reasonable efforts to provide a clean home for these Children. The fact that there has been no marked improvement in the Appellants' living conditions during the entire pendency of this matter demonstrates a lack of concern for the Children to such a degree that it appears unlikely that Appellants' will be able to provide a suitable home for the Children at any near date. Accordingly, we affirm this ground for termination of their parental rights.

### D. Substantial Noncompliance with the Permanency Plan

As noted above, the trial court found that DCS had not met its burden to prove the ground of substantial noncompliance with the permanency plan on the part of Father. However, the

court did find sufficient proof to establish the ground *vis-à-vis* Mother. DCS does not raise an issue as to the trial court's findings on this ground as to Father. Accordingly, we will only discuss the permanency plan requirements pertinent to Mother.

Tennessee Code Annotated Section 36-1-113(g)(2) provides that parental rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." However, as discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn.Ct.App.2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548.

*Id*. at 656-57. "Nonetheless, the permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." *In re C.S., Jr., et al.*, No. M2005-02499-COA-R3-PT , 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id*.

As noted above, the trial court ratified the initial permanency plans on December 6, 2013, finding that the Appellants' requirements were reasonably related to remedying the reason for foster care and were in the Children's best interests. The permanency plans were revised on June 24, 2014. The revised plans reiterated the requirements set out in the initial plan, but added that Mother would complete a metal health assessment and follow any

- 15 -

recommendations thereof. The revised plan also required the Parents to attend marriage counseling. The Parents signed the revised plan on June 24, 2014, and the trial court ratified the revised plans on August 12, 2014. Again, the trial court found that the requirements contained in the revised plans were reasonably related to remedying the reasons for foster care and were in the best interests of the Children. Mother's responsibilities under these plans were to: (1) submit to random drug screens; (2) procure stable employment; (3) maintain stable clean housing appropriate for the Children; (4) demonstrate candor during assessments and with providers; (5) cooperate with service providers; (6) sign releases; (7) attend parenting classes; (8) submit to alcohol and drug assessment; (9) learn appropriate cleaning skills; (10) learn appropriate parenting skills; (11) submit to individual therapy/mental health intake; (12) pay child support; (13) participate in visitation; and (14) attend marriage counseling.

Concerning the foregoing requirements, in its order terminating her parental rights, the trial court made specific findings that Mother: (1) had submitted to random drug screens; (2) had not procured employment; (3) had not maintained a clean and stable house; (4) demonstrated candor with the providers; (5) signed releases; (7) attended parenting classes; (8) did not complete alcohol and drug assessment; (9) did not learn appropriate cleaning skills; (10) has failed to demonstrate that she has learned effective parenting skills; (11) did not complete individual therapy; (12) did not pay child support; (13) did participate in marriage counseling, but has not addressed issues raised in those sessions.

Turning to the record, it appears that Mother was well informed of her responsibilities under the permanency plans. Furthermore, it appears that Mother understood her responsibilities. As discussed above, DCS made reasonable efforts to help Mother to satisfy the permanency plan requirements. Despite DCS's efforts, the record indicates that Mother failed to make reasonable efforts.

The record shows that, at the time of the hearing, Mother was unemployed. She testified that she occasionally babysits, but there is no evidence that this is stable employment. The evidence indicates that the family is not financially stable. At the time of the hearing, Father was employed at Burger King, but was only making $8.25 per hour. Mother had no income except for the occasional babysitting job.

Concerning the condition of the home, we have previously discussed the evidence demonstrating that the conditions in the home have not substantially improved throughout these proceedings. Even after the Parents moved from the original residence, the apartment they rented was only two bedrooms, with a clause in the lease that no children would be living there. Despite the lease condition, the evidence indicates that Appellants allowed a family of five to move into one room in the apartment. In addition, DCS, upon inspection, discovered live maggots and other dangerous and unsanitary conditions throughout the residence.

- 16 -

Lisa Tipton, the Executive Director of Families Free, testified that, from her review of the records, the Parents have a "world view" that is indicative of a value system that it is okay to live in unclean housing conditions. Ms. Tipton testified that Families Free employees had addressed environmental concerns and trash in the home many, many times, but had not seen any substantial improvement. Accordingly, Ms. Tipton testified that there "was very little progress being consistent with the service plan [and Parents] do not [seem] to notice the unsanitary conditions around them." In sum, the record shows that whatever efforts Mother made fell far short of reaching the overall goal of the permanency plans, which was for Mother to demonstrate that she had changed her conditions so that she could take full responsibility for raising her three Children in a healthy, safe, stable home. Therefore, we conclude that the evidence preponderates in favor of the trial court's factual findings, and that those findings establish by clear and convincing evidence that Mother did not comply substantially with the requirements of the permanency plan, and that her parental rights may be terminated on this ground.

### E. Severe Child Abuse

Tennessee Code Annotated Section 36-1-113(g)(4) provides a ground for termination of parental rights where:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

Tennessee Code Annotated Section 37-1-102(b)(21)defines "severe child abuse," in relevant part, as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
> (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).

Tennessee Code Annotated Section 39-15-402(d) provides, in relevant part, that "serious bodily injury . . . to the child includes, but is not limited to, second- or third-degree burns . . . injuries to the skin that involve severe bruising . . . ." This Court has discussed the "knowing" criterion set out in Tennessee Code Annotated Section 37-1-102(b)(21)(A)(i) as

- 17 -

follows:

> The words "knowing" and "knowingly" do not have fixed or uniform meanings. Their meanings in particular cases vary depending on the context in which they are used or the character of the conduct at issue. ***Still v. Comm'r of the Dep't of Employment & Training***, 657 N.E.2d 1288, 1293 n. 7 (Mass. App .Ct. 1995), aff'd, 672 N.E.2d 105 (Mass.1996); ***State v. Contreras***, 253 A.2d 612, 620 (R.I.1969). Because the parties have not supplied us with definitions of these terms, statutory or otherwise, we will employ the basic rules of statutory construction to ascertain their meaning. Accordingly, we will give these words their natural and ordinary meaning, ***Frazier v. East Tenn. Baptist Hosp., Inc***., 55 S.W.3d 925, 928 (Tenn. 2001), and we will construe them in the context of the entire statute and the statute's general purpose. ***State v. Flemming***, 19 S.W.3d 195, 197 (Tenn.2000). We will also construe the words in a manner consistent with the rules of grammar and common usage.
>
> The word "knowing," when used as an adjective, connotes a state of awareness. ***In re D.P.***, 96 S.W.3d 333, 336 (Tex. Ct. App. 2001). Thus, it requires some inquiry into the actor's state of mind. A person's conduct is "knowing," and a person acts or fails to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her. Persons act "knowingly" when they have specific reason to know the relevant facts and circumstances but deliberately ignore them.
>
> For the purpose of determining whether a parent's conduct runs afoul of Tenn. Code Ann. § 37-1-102(b)(21), parents who are present when a child is abused but who fail to intervene to protect the child have knowingly exposed the child to or have failed to protect the child from abuse. However, the "knowing" requirement in Tenn. Code Ann. § 37-1-102(b)(21) is not limited to parents who are present when severe abuse actually occurs. A parent's failure to protect a child will also be considered "knowing" if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur. ***West Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.***, 475 S.E.2d at 878-879.

***In re R.C.P.***, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004). With the foregoing authority in mind, we turn to the record.

Here, the finding of severe child abuse stems from the burn that Dustin sustained while in his Mother's care and, as it applies to Father, from the failure to procure medical attention for Dustin's wound. As discussed briefly above, on June 16, 2014, during a home visit, DCS employees noted that Dustin had a burn on his wrist and lower arm. Mother told Ms. Hodge that the child had been burned several days earlier when he spilled a bowl of Ramen noodles on himself. She explained that Dustin had used a stool to reach the microwave where the bowl of soup was. However, Mother could not produce the stool when asked to do so. At the time of the injury, Dustin was too young to explain how he sustained the burn. The only witness to the event was Mother. The record indicates that, when Father returned home, he chose not to seek medical attention for the child. Rather, he explained that he called a local pharmacy to ask about treatment. Father stated that he went to the pharmacy and purchased "extra strength pain reliever Neosporin." When DCS examined the tube of ointment, however, they noted that it had expired in 2009.

Father testified that he did not cause the burn and that he was not present when it occurred. When asked why they had not taken the child to the hospital, both parents replied that they had not had time. Father specifically stated that he had not sought medical treatment for the child because he thought he was capable of dealing with the injury at home. He stated that he had dealt with second degree burns at work "all his life," and that he had sustained far worse injuries himself without seeking medical attention. Father testified that, when he arrived home on the day Dustin suffered the injury, the child's arm had already been bandaged. Father stated that he wiped the burn down with alcohol and a cotton ball. He also stated that he used Neosporin on the wound. Father further testified that he would sometimes apply honey along with the Neosporin. He stated that he had been "popping" the burn blisters that would arise on the wound. DCS noted that the child's wound was wrapped in toilet paper secured with scotch tape.

After removing the Children from the home, DCS took Dustin to the emergency room. Although Dustin did not initially appear to be in great distress with his wound, when the doctors cleaned and dressed the wound, he did cry at that point. Photographs of Dustin's arm were admitted into evidence. They show a rather large burn, with darker, burned skin coming off it. The wound is red and appears irritated.

Dr. Susan W. Jeansonne's testimony was admitted, by deposition, at the hearing on the petition to terminate parental rights. All parties stipulated that Dr. Jeansonne would be certified as an expert in the field of pediatric clinical care. Dr. Jeansonne was Dustin's treating physician. She testified that Dustin's burn was a "partial thickness burn with portions of skin still intact." She stated that this was a well-demarcated burn on the child's wrist, which almost completely encircled it. Some areas of the burn were first degree burns, which were red and similar to sunburned areas; other portions of the burn were second degree burns, which involved blistering. Dr. Jeansonne diagnosed the burn as a "thermal direct contact burn." She further diagnosed Dustin as neglected due to his poor hygiene and

- 19 -

the delay in seeking treatment. Additionally, she diagnosed child abuse.

Importantly, Dr. Jeansonne testified that, in her medical opinion, the child's burn did not occur from a splash-type incident with liquid being poured down and flowing onto the arm, as Mother had stated. Dr. Jeansonne did state that a hot liquid poured on an article of clothing that the child was wearing "could" cause a burn such as the one she observed on Dustin's arm, but such injury would only occur if the child was wearing clothing with a tight cuff. She also testified that the demarcation "could" have occurred if the liquid had spilled farther up his arm on his sleeve and soaked into the bottom around his wrist. The trial court noted that there was no testimony that Dustin was wearing any type of shirt or sweatshirt when he sustained the injury.

Dr. Jeansonne testified that a burn such as Dustin's would have caused him substantial and consistent pain, which could have been lessened by pain medication and proper treatment. She further testified that, left untreated, the burn posed a serious risk for infection and scarring. Dr. Jeansonne stated that the Parents should have sought immediate medical attention. Had they done so, the wound could have been properly cleaned, debrided, and bandaged. Dr. Jeansonne opined that the blisters on Dustin's burn should not have been burst as this action would increase the risk of scarring and infection. Dr. Jeansonne testified that, in her medical opinion, the injury to Dustin's arm was consistent with non-accidental trauma.[3]

In finding that DCS had met its burden of proof on the ground of severe child abuse as to Mother, the trial court, in its order terminating Appellants' parental rights, made the following, relevant findings:

> 138. The Court finds that the mother was the only witness to the second (2nd) degree burn sustained by the minor child, Dustin. Further, the Court finds that Dustin was very young when he sustained the wound, and is not capable of describing how the injury took place.
>
> ***
>
> 140. According to the medical testimony presented in this cause, the burn was not a splash burn similar to what the mother told DCS. Expert testimony established that the injury to the child was non-accidental in nature.
>
> 141. DCS has proven, by clear and convincing evidence, the ground of severe

_____

[3] Based on the injuries to Dustin's arm, at the time of the hearing, both parents were charged with two counts of felony child abuse. At the time of the hearing, the charges had been bound over to the Grand Jury.

child abuse against Respondent Elizabeth J[.].

Based on the testimony and evidence outlined above, we conclude that the evidence preponderates in favor of the trial court's factual findings, and that those findings establish by clear and convincing evidence that Mother's parental rights may be terminated on the ground of severe child abuse as set out at Tennessee Code Annotated Section 36-1-113(g)(4).

Concerning the ground of severe child abuse as it applies to Father, in its order terminating parental rights, the trial court made the following, relevant, findings:

142. The Court finds that Respondent Jeremiah J[.] knowingly failed to protect the minor child from abuse or neglect that is likely to cause serious bodily injury or death. The Court finds that the father's failure to protect the child was "knowing" because, by his own testimony, he was aware that the child sustained a second degree burn. Father testified that he was aware enough to know that the child needed some type of treatment for the injury, but that, instead of seeking medical care for the child, he instead elected to go ask a pharmacist . . . how to treat the wound.

143. The Court finds that the minor child had TennCare insurance at the time that he was burned in the home. The Court finds that all the father had to do to seek treatment was to contact the child's family service worker at DCS. Further, the Court finds that, if the family was out of money such that they could not afford bandaging for the injury, the father could have taken the child to the emergency room or other medical provider at no cost to himself or the family.

\*\*\*

146. The Court finds that the father was presented with sufficient facts from which he could have and should have recognized that severe child abuse had occurred, and that he had actual knowledge of the relevant facts and circumstances and either was in deliberate ignorance of or in reckless disregard of the information that was presented to him. He knowingly failed to act to protect his son from severe child abuse.

147. DCS has proven, by clear and convincing evidence, the ground of severe child abuse against Respondent Jeremiah J[.].

Based on the testimony and evidence outlined above, we conclude that the evidence preponderates in favor of the trial court's factual findings, and that those findings establish by clear and convincing evidence that Father's parental rights may be terminated on the

ground of severe child abuse as set out at Tennessee Code Annotated Section 36-1-113(g)(4).

## V. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App.1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

(1)Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

\*\*\*

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

\*\*\*

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe. . . .
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from

- 22 -

effectively providing safe and stable care and supervision for the child . . . .

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S*., 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

As discussed in detail above, the record indicates that the Parents' living conditions continue to be unsanitary and, thus, unsafe for these Children. Even after extensive services have been offered to the Appellants, it does not appear that they have made, or will be able to make, a lasting adjustment so as to be able to properly care for these Children. As indicated by Ms. Tipton, even after having their Children removed from their custody, Appellants still do not seem to comprehend the severity of their living situation and the effect that it has had on the Children. Their continual denial in this regard does not bode well for long term parenting success.

Meanwhile, the evidence suggests that these Children have flourished in their foster home. The foster mother testified that all three Children have been in her home since June 27, 2013; i.e., approximately two years from the time of removal from Appellants' custody to the date of hearing on the petition to terminate parental rights. The Children's foster parents are both employed as pharmacists; while the foster parents are at work, the Children are cared for by the foster grandparents or a family friend. The evidence indicates that the Children are well adjusted in the foster home. The foster mother testified that the Children enjoy playing games, and they have helped to raise and care for two chickens. Derrick has participated in football, basketball, and soccer; he also enjoys dance classes. Destiny is involved in cheerleading and dance. Dustin has participated in soccer and enjoys watching his older sibling participating in their various activities. The Children have gone on

vacations together with their foster parents.

The evidence further indicates that the Children are doing well academically. The foster mother testified that she and her husband work on homework with the Children. Although the Children were described as "disruptive" when they first came into foster care, the foster mother testified that their behavior has improved, and the Children now listen to instructions from the foster parents.

After the trial home placement was revoked in June of 2014, the Children came back into the foster home. The foster mother testified that, at first, the Children reverted to behavior similar to that demonstrated when they first came into DCS custody. However, after approximately one week back in the foster home, the Children's behaviors readjusted. The foster mother testified that she and her husband would "absolutely like to adopt the children."

From the totality of the evidence, it appears that these Children have found, in their current foster home, perhaps the only stability they have ever known. To remove the Children from this stable environment would likely be detrimental to their emotional, psychological, and physical wellbeing. This is especially so in light of the overwhelming evidence that the Parents have failed to make an adjustment in their living conditions such that they could provide a proper home for these Children at any near date. Therefore, we conclude that there is clear and convincing evidence in the record to support the trial court's finding that termination of Appellants' parental rights is in the best interests of these Children.

## VI. Conclusion

We affirm the order of the trial court, terminating the parental rights of both of the Appellants. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed one-half to Appellant/Father, Jeremiah J., and one-half to Appellant/Mother, Elizabeth J. Because both Appellants are proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE